M. L. STEWART, executrix, &c. *against* W. I. STEWART, and his wife, administratrix, &c. and the BANK OF AMERICA.

Where a marriage settlement, giving to the wife the control of her separate property, during coverture, and the power of appointment, with the assent of her husband, contains no express provision for its disposition, in the event of her death, and in default of her appointment, and she dies without making any appointment, the property goes to the husband, as survivor, as if no settlement had been made.

As, where, after such settlement, money coming to the wife from her father, was paid to the husband, there being no acting trustee at the time, and he invested it in bank stock in her name, but received the dividends to his own use, and after her death, took out administration on her estate, and received the dividends until his death: it was *held*, that the executrix of the husband was entitled to the stock, and that the administratrix, *de bonis non*, of the wife, was accountable for it, as trustee, to the legal representative of the husband.

Where, in the deed of settlement, the husband, after covenanting to allow his wife to enjoy her separate property to her own use, during the coverture, and that she might convey the same, &c. added, that he thereby released all his marital rights in and over the same, &c. *Held*, that this release was to be construed in connexion with the words immediately preceding, and operated only as to his rights during coverture, and did not affect his rights as survivor of his wife.

THE plaintiff is the widow and executrix of *William R. Stewart*, deceased. The testator, on the 13th of *February*, 1809, married *Catharine*, the widow of *Joseph Hopkins*, and after her death married the plaintiff. After the marriage of the testator with his former wife, and during their lives, twenty-three shares of the capital stock of the *Bank of America*, were purchased for, and transferred to her, by the name of *Catharine Stewart*, and have since stood in the books of the bank in her name. The stock was purchased with the money accruing to the testator, in right of his

*June 25th.*

former wife, as widow of *Joseph Hopkins*, who died intestate. During the life of his wife, *Catharine*, the dividends on the stock were paid to him. She died on the 19th of *June*, 1815, and the testator, as her husband, administered on her estate; and as such administrator, continued to receive the dividends until his death. After his marriage with the plaintiff, he made a will, dated *April* 18th, 1817, and appointed her sole executrix. The testator died *September* 21st, 1818, and the plaintiff proved the will, and qualified as executrix. The bill charged, that the plaintiff was entitled to the shares of stock and the dividends thereon, as *assets* of the testator, to be applied according to the will. It stated, that after the death of the testator, the defendants, *Stewart* and his wife, she being a daughter of the testator's former wife, by her former husband, *J. H.*, on the 3d of *November*, 1818, applied to the surrogate, and letters of administration, *de bonis non*, upon the estate of her mother, were granted to her, as daughter of the deceased. That the defendants, *S.* and his wife, in her right, claim the shares and dividends; and she, as administratrix, had received the dividends, and was about to commence a suit against the bank for the last dividend, which the bank had declined paying, in consequence of a written notice from the plaintiff. In support of their claim, the defendants, *Stewart* and his wife, alleged, that *Catharine H.*, before her intermarriage with the testator, on the 13th of *February*, 1809, executed an indenture, by which, after reciting the intended marriage, and her desire to provide for the future support of herself and children, &c. in consideration of the premises, and of one dollar, &c., conveyed to *Jacob Schieffelin*, his heirs and assigns, all her estate, real and personal, in law and equity, *in trust*, for the future benefit of herself, free from the control of her intended, or any other husband; and to sell and dispose of the same, as he might judge most advisable to promote her interest, and to pay the proceeds to her, without the control of her said hus-

band, &c. and to reconvey the estate to such persons as she,

with the assent of her future husband, should nominate and appoint, &c. This agreement was executed a few hours before the marriage between the testator and *C. H.*, and without his knowledge or consent. The bill charged, that it was void, as being against his marital rights, and had been abandoned and treated as a nullity during the marriage; that it was obtained from *C. H.* by fear, and through the misrepresentation of *Jacob S.*; and that she having, afterwards, lost all confidence in him, and being desirous to withdraw her property from his control, did, on the 5th of *July*, 1810, with the advice of the testator, revoke the indenture. The testator, in contemplation of his marriage with *Catharine H.*, on the 11th of *February*, 1809, executed a covenant to and with *William R. Stewart* and *Alexander I. Stewart*, as trustees for *C. H.*, his intended wife, reciting his wish to secure to her her real and personal property, so that she might as fully enjoy it, to all intents and purposes, after marriage, as though she were a *feme sole*; and he covenanted with the trustees above named, that *C. H.*, *during coverture*, should have to her own use, all the personal property belonging to her at her marriage, or which might come to her during the continuance of the marriage, by devise or otherwise; and that she might convey away the same, according to the forms of law, by testament or otherwise; and that, during coverture, she should enjoy the right of dower in the estate of her late husband, and the rents and profits of any real estate to which she might be entitled, as fully as if she had remained a *feme sole*; thereby " releasing all his marital rights in and over the same :" and the testator further covenanted, on request, to make any other assurances, to carry more fully into effect the intent of the covenant. The bill charged, that this covenant was not delivered to the trustees, but remained in the possession of the testator, until after the death of *Catharine H.*, when it was deposited for his use with *J. A.*,

a subscribing witness to it, with whom it remained until after the death of the testator, when, at the request of the defendants, S. and his wife, it was proved and recorded. The plaintiff alleged, that by the true construction of this agreement, admitting it to be valid, as regarded the personal estate, it produced merely a suspension of the marital rights of the testator during the coverture, and was not a relinquishment of them, especially as C. H. made no disposition of her personal estate by will or otherwise ; and the personalty, therefore, on her death, devolved to the testator, her husband, who survived her, and administered on her estate, and on his death, it passed to the plaintiff, as his executor. The bill further charged, that the testator, during his life, was quietly permitted, by the defendants, S. and his wife, and the other children of C. H., to receive the dividends on the stock ; and his right to administer on his wife's personal estate, for his own benefit, was not questioned, nor did the defendant, Mary S., apply for letters of administration, until after the death of the testator. The bill prayed, that the Bank of America might be decreed to pay the dividends on the stock to the plaintiff, and that the defendants, S. and his wife, may be ordered to transfer the shares to the plaintiff, as executrix, to be applied by her in the due course of administration of the assets of the testator; and that they may account to the plaintiff for all dividends received by them ; and that the bank may be restrained from paying the dividends to S. and his wife, or permitting the transfer of the shares, and that S. and his wife be restrained from receiving any more dividends, or suing for them, or transferring the shares, &c.

The defendants, W. S. Stewart and his wife, in their answer, admitted most of the facts stated in the bill, and relied on the marriage articles of the 13th of February, 1809, which they admitted to have been executed on the day of the marriage, without the knowledge or concurrence of the testator. They denied, that the instrument was ever treat-

ed as a nullity, and alleged that the testator and his wife acted upon it, and permitted *Schieffelin*, the trustee, to act under it. They alleged that the revocation was illegal. They admitted the *covenant* of the testator, of the 11th of *February*, 1809, and alleged that both the indenture and covenant were intended to fulfil the original agreement between the testator and his wife, *Catharine;* and that the covenant operated as a relinquishment of his marital rights; and they insisted on the fact of the testator's administering on his wife's estate, as evidence, that he did not consider himself, as husband, entitled to it.

The bank, in their answer, admitted the facts stated in the bill, as to the shares and dividends, and the notice to them from the plaintiff, &c. Testimony was taken in the cause; and *John J. Stewart*, who married a daughter of *Catharine H.*, the former wife of the testator, having been examined as a witness for the defendants, S. and his wife, notice was given by the plaintiff, of a motion to suppress the testimony at the hearing.

The cause was argued by *Wells* and *G. W. Strong*, for the plaintiff; and by *T. A. Emmet*, for the defendants, who examined, very critically and at large, the proofs and exhibits in the case.

*For the plaintiff*, it was contended, 1. That the testimony of *J. J. S.* ought to be suppressed, on the ground that his wife had a direct interest in the event of the suit, as she, being one of the next of kin to *Catharine H.*, was entitled to a distributive share of her personal estate, and, of course, to one fourth of the stock in question, in case the plaintiff's claim was defeated. But independent of the question of interest, it was a settled rule, that the husband and wife cannot be witnesses for or against each other. (*Davis* v. *Dunmoody*, 4 *Term Rep.* 678. *Lord Raym.* 744. 2 *Str.* 1095.) And the witness himself is interested, for as long as he lives with and

1823.

STEWART
v.
STEWART.

maintains his wife, he is entitled to the interest or income of her separate property. (2 *Ves.* 560. 3 *Atk.* 20. 5 *Johns. Ch. Rep.* 480.)

2. As to the merits : The plaintiff is entitled to the relief sought for, independent of the ante-nuptial contracts. The controversy is between the representative of the husband and the representative of the wife, respecting her separate property, he having survived her, and she having left children by a former marriage. The rule is well settled, that where the husband dies before he administers on his wife's estate, her property belongs to his personal representatives ; and where he does administer and dies, the right of administration, *de bonis non,* belongs to his, not her, representatives ; and in this case, this Court will consider the administrator *de bonis non,* as a trustee for the representatives of the husband. (*Elliot* v. *Collins,* 3 *Atk.* 526. S. C. 1 *Wils.* 168. 1 *Vesey,* 15. *Cart* v. *Rees,* cited 1 *P. Wms.* 381. *Humphrey* v. *Buller,* 1 *Atk.* 458.) The objection, then, to the claim of the plaintiff, must rest on the two ante-nuptial contracts.

3. As to the instrument of the 13th of *February,* 1809, executed by *Catharine H.,* it is invalid and void ; first, because it was procured by the false and fraudulent misrepresentations of *Schieffelin ;* and, secondly, because it was executed without the knowledge or consent of her intended husband. The ·widow of the testator, in her answer to a bill filed by *Schieffelin,* relative to a settlement of her former husband's estate, stated under oath, that this instrument was executed by her, under the influence of fear, and through the misrepresentations made to her by *S. ;* and that, having afterwards lost all confidence in him, she, on the 5th of *July,* 1816, with the advice of her husband, revoked it.

4. But admitting this to be a valid instrument, it does not defeat the plaintiff's right. It contains no disposition .of the property, in the event of her death, either before or after the death of her intended husband ; nor any power of

appointment, except for the sole purpose, and that in a prescribed form, of changing the trustee. She had, therefore, no power, during the coverture, of disposing of her separate property, by will, appointment, or otherwise, to take effect after her death; and the Court cannot give a power to her, where none has been reserved to her by the deed of settlement. (*Seaman* v. *Duell*, 10 *Ves.* 581.) Mrs. *S.* having died, without any attempt to make any disposition of her property, the question arises, on whom does it devolve? It must be disposed of, either by the deed of settlement, or by the operation of law. It is clear that the instrument does not, in terms, contain any disposition of it; and a marriage settlement which interrupts and controls the operation of law, cannot, by intendment, be carried beyond its express provisions and fair construction. Where the settlement stops, the law comes in to supply the defect, as it does in the case of a partial testamentary disposition. And the law, in this case, must interpose, and give to the husband the right to administer on the estate of his deceased wife, for his own benefit.

Again; the fund in this case, consisted of a bond and mortgage owned by *Catharine H.*, which, previous to the settlement, she assigned to *Schieffelin*, under the secret or implied trust that he should keep them for her separate use. The mortgage was, afterwards, paid to her husband and her during their lives; and at the request and with the concurrence of the trustee, it was invested in the bank stock which is the subject of the present suit. Thus, the husband had the possession of the fund, which vested the property in him, notwithstanding the settlement. (*Pawlet* v. *Delaval*, 2 *Ves.* 662.) Marriage settlements, being mere creatures of equity, are to be so construed as to effectuate the intent of the parties. (*Meth. Epis. Church* v. *Jaques*, 3 *Johns. Ch. Rep.* 89.) Now, the obvious intention of *Catharine H.* in making this settlement, was, to protect the property against the supposed debts of her intended

1823.

STEWART
v.
STEWART.

husband, under the apprehensions which had been artfully excited in her mind. Such being her sole object, it could not have been her intention to impair or abridge the marital rights of her husband, in case he survived her.

5. As to the covenant of the 11th of *February*, 1809, the defendants, *S.* and his wife, do not rely upon it as necessary to establish their right; but there is no evidence of its having been delivered to, or its being in possession of either of the trustees; nor is there any evidence that the trustees knew of its existence. Where an instrument is executed directly to the party beneficially interested, his assent is indispensable to its legal validity; and where the conveyance is in trust, either the trustee or the *cestui que trust* must assent to it. (*Nicoll* v. *Mumford*, 4 *Johns. Ch. Rep.* 529.) But admitting that it was duly delivered, it amounts to nothing more than a suspension of the marital rights during the coverture. It does not operate as a relinquishment of them after her death. It rests in covenant merely, and the legal rights of the husband are not impaired by it. The intended wife is not a party to it; it was not executed in consequence of a previous agreement; nor did it make any part of the marriage contract. The children of the wife, by her former husband, are not mentioned; nor is any provision made for them. It was a voluntary act of the husband, without any consideration; and it ought, therefore, to be strictly construed.

*For the defendants*, it was insisted, that, as to the preliminary objection to the testimony of *J. J. Stewart*, the property being settled to the separate use of the wife, he had no interest in it.

As to the principal questions, it was contended, that the evidence did not support the objection to the deed of the 13th of *February*, 1809, that it was obtained through undue influence, or fraudulent misrepresentations. The instrument called "a deed of revocation," which had been relied on, was, as appeared from the testimony of witnesses,

(for the deed itself could not be found,) merely for the purpose of changing the trustees, and preserved the trust unimpaired. It is, therefore, a confirmation of the trust deed by Mrs. *S.* and her husband, and proves that the testator knew of the deed, and acknowledged its validity. The evidence showed, that *Schieffelin* acted, and was treated, as a trustee. The instrument executed by the testator himself, on the 11th of *February,* 1809, even if it were not valid as a deed, shows that he was satisfied with the settlement made by his wife of her property, and that he could have no disposition to annul or revoke the trust. If the assent of the grantee be necessary to give validity and effect to the deed, there is sufficient evidence of assent, which may be implied, or inferred, from circumstances.

As to the objection, that the deed was not delivered to the trustee, or *cestui que trusts,* it may be answered, that the deed was delivered to Mr. *Anthon* for them, and the slightest recognition of it by either of them, will give it effect. (3 *Hen.* VI. 27. 2 *Leo.* 110. pl. 45. *Dyer,* 167. c. *Moore,* 300. pl. 448. 9 *Hen.* VI. 37. b. 13 *Viner Abr.* tit. *Fait,* M. 3. pl. 24. K. 12. pl. 22.)

This deed is inartificially drawn, but it gives the wife full power to aliene her property; and, with the consent of her husband, to call on the trustee to execute a conveyance according to her direction. In the case cited from 10 *Ves.* 580. the property was not settled absolutely to the use of the wife, but the fund was in *trust* for her use absolutely, if she survived her husband; and it was so far contingent and reversionary. It was settled, not as separate property, but to prevent any person from having a control over it, while it was reversionary and contingent, as an inaccessible source of future provision. And Sir *William Grant* very properly observed, that the Court could not give a power, (by a private examination,) where none was reserved to her by the settlement. But where property is settled in trust, as the separate property of a married wo-

man, and no restriction put by the settlement on her power of alienation, she has a right, from the nature of her property, to aliene without the aid of a Court of Chancery. If the position of the plaintiff's counsel be correct, that " there is no power of appointment, except for the single purpose, and that in a prescribed form, of changing the trustee," then the only objection urged against the position taken by the defendants, that if there be a particular form of alienation pointed out by the instrument, which gives the wife the separate estate, it must be pursued, (*Socket* v. *Wray*, 4 *Bro. C. C.* 483.) is removed.    The case of *Socket* v. *Wray* has, however, been overruled ; and the doctrine for which we contend, is supported by the cases of *Peacock* v. *Monk*, 2 *Ves.* 190.   *Hulme* v. *Tenant*, 1 *Bro. C. C.* 16.   *Fettiplace* v. *Gorges*, 1 *Ves. jun.* 46.   3 *Bro. C. C.* 8.   *Rich* v. *Cockel*, 9 *Ves.* 369.   *Wagstaff* v. *Smith*, 9 *Ves.* 520. *Heatley* v. *Thomas*, 15 *Ves.* 596.   *Jaques* v. *Meth. Epis. Church*, in error, 17 *Johns. Rep.* 547.

Both the instruments must be taken together ; and it is apparent from them, and the evidence taken in the cause, that they destroy, and were intended to take away, all the marital rights of the husband over the property, and to operate after the wife's death, if he survived her.   The shares in question, were purchased after the marriage, with moneys received by the wife from her father, and in the name of the wife.   If the shares were considered as the property of the husband, or were ever intended for his use, why were they not, during his life, transferred to his own name ?   But the shares remained in her name until after her death ; and before he took out administration, he deposited the deed in question with Mr. *Anthon*.   Surely, if he had thought the deed had ceased to have any effect after his wife's death, he would not have left it with Mr. *A.*, and for safe custody, as is fairly to be presumed.   The testator, instead of claiming the property as his own, or *jure mariti*, gave a bond with sureties, on taking out administration, though

there is an exception in the statute, where administration is granted to the husband. It is admitted, that there are some *dicta* in the books, which speak of the husband as next of kin to the wife; but later and numerous cases have decided, that he is not; and that he obtains administration and her whole personal property, by force only of his *marital* rights; and if he renounces those rights, the property must be distributed to her next of kin, excluding the husband. If he gets administration, he takes the property as trustee for the next of kin, without any beneficial interest to himself. (*Watts* v. *Watts*, 3 *Ves.* 244. *Garrick* v. *Camden*, 14 *Ves.* 372. *Anderson* v. *Dawson*, 15 *Ves.* 537. *Bailey* v. *Wright*, 18 *Ves.* 49. 1 *Swanton*, 39. S. C.) The rights of the husband, in relation to the wife's property, commence with the marriage; and after her death, he can claim nothing but a continuation of those rights, or *jure mariti*. When, therefore, he releases and renounces all his marital rights in regard to the property of his intended wife, and no right attaches by the marriage, after her death, the property goes to her next of kin.

*For the plaintiffs, in reply,* it was argued, after discussing the objections as to the validity of the instrument, that, even admitting the settlement to be valid, yet, in the event which had happened, it interposed no bar to the marital rights of the testator. Conceding that the wife had, by the instrument, the *jus disponendi*, as to her property; yet, as she never exercised the power of disposing, it could be of no avail after her death. She died, as it were, intestate; and the question then remained, who is to take her property? Does it belong to her husband, or to such of her next of kin, as would have taken it, had she remained a *feme sole*? The only object of the settlement, was to place the property beyond the reach of her husband's creditors; and this could be effected in no other way than by giving her the complete dominion over it, during coverture. The settlement goes no further. It makes no disposition, in the event of her death, either

1823.

STEWART
v.
STEWART.

before or after the death of her intended husband. In *Fettiplace* v. *Gorges*, (1 *Vesey*, 49. 3 *Bro. C. C.* 10. S. C.) Lord *Thurlow* says, "if the wife makes no disposition, the husband takes it, as next of kin, not from his marital rights." The husband has the undoubted power to dispose of all his personal property by will. But if he dies, without exercising that power, his widow will be entitled to the distributive share given by the statute. Now, a settlement puts the wife in the same situation in regard to her property; it secures to her the power of appointment over it, but if she neglects to exercise that power, the husband's rights remain, just as those of the wife would be, in regard to his property, if he should die intestate. It is objected, that the object of the settlement was to provide for the children of Mrs. *S.*; but if that was the object, it is extraordinary that there is no provision made for them in the settlement. They are merely referred to in the recital, but that cannot supply the defect of an express provision. (5 *Johns. Ch. Rep.* 23.)

Again; as to the objection that the husband does not succeed to his wife's personal property as next of kin, but by his marital rights: As long as he does succeed to it, it is perfectly immaterial in what character he takes. Lord *Thurlow* and Lord *Hardwicke*, as well as this Court, (*Schuyler* v. *Hoyle*, 5 *Johns. Ch. Rep.* 207.) put the husband's right upon the statute of distributions, as her next of kin. But the right of the husband to administer on his wife's personal estate, for his own benefit, does not depend upon any distinction between marital rights and those of next of kin. It is a common law right, recognised, not conferred, by the statute of distributions. In *Humphrey* v. *Buller*, Lord *Hardwicke* says, "during covérture, husband and wife are but one person; but when that coverture is dissolved, by the death of the wife, the husband is certainly the next friend and nearest relative, and has a right to administer, exclusive of all other persons." This unity of person

involves a corresponding unity of interest, which can be severed only through the medium of a marriage settlement; and as far as that goes, the property of the wife may be distinct from that of the husband ; but where the settlement is silent, the unity of interest remains.   Accordingly, we find, that in every marriage settlement, where it is intended to exclude the marital rights of the husband, in the event of his surviving his wife, and in default of her appointment, an express provision is always inserted, for that purpose.   The cases cited on the other side are clearly distinguishable from the present.   In *Bailey* v. *Wright*, there was an express provision for the husband in the settlement; and Sir *Wm. Grant* says, " the question is not, whether the husband can, in any case, or for any purpose, be, as he has sometimes been called, the next of kin to his wife, but whether, according to the true construction of the settlement, it was intended that the husband should take under that denomination."   In *Garick* v. *Camden*, (14 *Vesey*, 372.) the question arose as to the widow's right to a distributive share in her husband's residuary personal estate, under a clause in his will, in these words, " to be divided among *my next of kin*, as if I had died intestate."   Lord *Eldon* takes a distinction between these words, and where it is said, " to be divided, as if I had died intestate."   In regard to the latter phraseology, he did not deny, that a will, expressed in those very terms, might, upon the whole, admit of such a construction, as would let the widow into a share of the residuary personal estate.   In the present case, where no disposition is made of the property by the instrument·itself, or by the wife's appointment, the law interposes the very words, " to be divided, as if I had died intestate."   And, of course, the husband, as next of kin, or *jure mariti*, is entitled to the property.

As to the deed of the 11th of *February*, Mr. *A.*, in his testimony, does not say, that it was delivered, but merely that Mr. *S.* brought it to his office, where it remained.   He

1823.

STEWART
v.
STEWART.

was merely a depositary. There is no evidence of such a delivery as the law contemplates. Further, the deed was entirely destitute of consideration. It cannot, therefore, be supported in equity. (*Newland on Contracts*, 65.) Even if it were a valid deed, it amounts to no more than the one of the 13th of *February*, and is liable to the same observations.

But, under the circumstances of this case, these shares are not affected by the operation of either of the instruments of settlement. The fund originally consisted of a bond and mortgage, which were assigned by Mrs. *S.* to *Schieffelin*, previous to her second marriage; and the money was, afterwards, paid to her and her second husband during coverture, and *he* invested it, in *September*, 1813, in bank shares, in her name. Now, when the money was paid, it could not have been protected by either of the deeds of settlement, since there was, at that time, no trustee; for *Schieffelin* had long ceased to act, and his proposed substitute had never been clothed with a legal title. If the settlement of this fund was valid, it must be so deemed, by reason of a ratification subsequent to the marriage; and it would then be a post-nuptial settlement, not supported by any ante-nuptial agreement, nor by any consideration moving between the husband and wife. (10 *Ves.* 148. 3 *Johns. Ch. Rep.* 550. 6 *Ves.* 662. 1 *Ves.* jun. 54.) The money, therefore, when it was paid, was a *chose in possession*, and, as such, belonged absolutely to the husband; and a subsequent delivery of the deed of settlement could not devest the husband's right. If the money had been paid into this Court, pursuant to an order, it would have belonged to the husband, subject only to a suitable provision out of it for the wife. (*Prec. in Ch.* 412. *Amb.* 509. 2 *Eden.* 337. 1 *Madd. Rep.* 450.) The subsequent investment of the money in the bank shares, was the act of the testator. Had he put it out on a bond and mortgage in their joint names, or in the name of his wife

only, he could have sustained an action on the bond in his own name alone. (*Alleyn*, 36. 4 *Term Rep.* 616. 2 *Atk.* 207. 5 *Johns. Ch. Rep.* 209. 1 *Str.* 229. 2 *Mod.* 217. 2 *Ves* 675.) The right of action being vested in the husband alone, during coverture, could not be devested by the death of the wife, or that of the husband; and it passed to his legal representatives, on his death. Though the investment was in the wife's name, yet the husband could, at any time, have compelled the bank to transfer the shares to himself. (10 *Johns. Rep.* 484. *Doug.* 524. 3 *Ves.* 97. 617. 9 *Ves.* 174.) Even considering the stock as a chose in action belonging to the wife, which the husband had not reduced into possession during her life, yet, as he survived her, he might, as her administrator, at any time have reduced it into his possession; and the plaintiff, as his representative, has the same right, as against the defendants.

Besides, the defendants are concluded by their acquiescence in the dividends being received by the husband, and appropriated to his own use, during the whole time he survived his wife; and that with the knowledge and consent of *Schieffelin*. (*Pawlet* v. *Delaval*, 2 *Ves.* 662. 1 *Jac. & Walk.* 451.)

THE CHANCELLOR. The preliminary question, touching the competency of the testimony of *John James Stewart*, is first to be disposed of. He has been examined in chief, on behalf of the defendants, *W. J. Stewart* and *Mary Stewart*; and he has evidently a direct interest in right of his wife, in support of the defence set up by those defendants, and of their claim to the twenty-three bank shares. It is admitted, that if the claim could be supported, his wife, as one of the next of kin to *Catharine Stewart*, would be entitled to a distributive share of the stock; and it is well settled, that the husband cannot be a witness for or against his wife. His testimony must, therefore, be suppressed.

1823.

STEWART
v.
STEWART.

A husband cannot be a witness for or against his wife.

**1823.**

STEWART
v.
STEWART.

When we come to look into the merits of the case, it is perceived, at once, that the title of the defendant, *Mary Stewart*, as administratrix *de bonis non*, to the shares in question, in opposition to the claim of the plaintiffs, must rest entirely upon the force and effect to be given to the two ante-nuptial instruments stated in the pleadings and exhibited in proof, and upon which the counsel have commented so largely. If those instruments be placed out of view, the plaintiff, as executrix of the husband, is entitled to call upon the administratrix *de bonis non* of the wife, to account for the bank shares, because, upon the death of *Catharine Stewart*, her husband became entitled to administer upon her personal estate, and to take to himself all her personal property, in action as well as in possession. If a husband dies before he administers, or before he has completed the administration of his wife's estate, though the right of administration may, perhaps, in that case, belong to the wife's next of kin, yet such an administrator will be regarded by this Court as a trustee for the representatives of the husband, and be held accountable to them for the personal property of the wife. These are well established rules, that do not seem to admit of doubt or dispute. (*Squib* v. *Wyn*, 1 *P. Wms.* 378. *Cart* v. *Rees*, cited by Lord Ch. *Cowper* in that case. *Lady Aiscough's* case, also cited *ibi. Elliot* v. *Collier*, 3 *Atk.* 526. 1 *Ves.* 15. 1 *Wils.* 168. S. C. *Humphrey* v. *Bullen*, 1 *Atk.* 458.)

If a husband survives his wife, and dies without administering on her property, or before he has completed the administration, and the wife's next of kin administer, such administrator is a trustee for the representatives of the husband.

1. The marriage article executed by *Catharine Hopkins*, on the 13th of *February*, 1809, on the eve of her marriage, is said to have been procured from her by fraud, practised by her trustee, and to have been executed also without the knowledge or consent of *William R. Stewart*, her husband, and, consequently, to have been made in fraud of his marital rights. I do not think it will be necessary to examine the facts or the law in respect to either of these allegations, because, assuming the instrument to have been fairly procured, and validly made, it does not appear to create any obstacle to the admission of the plaintiff's claim.

This ante-nuptial article, recited the fact of her intend-ed marriage with *W. R. Stewart*, and that she was desirous of making a provision for the support and benefit of her-self and her children, free from the control of her intended husband, or of any husband, she might, thereafter, marry, over the same. It then granted and assigned all her estate, real and personal, in law and equity, to *Schieffelin*, in trust, for her future use and benefit, free from any control of her said husband, or any other person she might thereafter mar-ry; and in trust, that he should lease or sell the same, as to him should seem most advisable for her interest, and pay the proceeds to her or her assigns, without being account-able to her husband; and should reconvey the estate as she, with the assent of her husband, should nominate and appoint.

The recital speaks of an intended provision for her and *her children;* but the granting part of the deed is confined, and the trust, specially created, is limited exclusively to her own use and benefit; a provision for her children was left to rest upon the voluntary execution of her own power of appointment; and she never made any appoint-ment. The object of the provision was, to free the proper-ty and its proceeds from the control of her husband, *during the coverture ;* and there was no disposition of the property in the event of her death. She had, indeed, the power of appointment; and she might, with the assent of her hus-band, have made a disposition of the property to meet that event; but she did not exercise the power, or appoint the uses to which the property should be applied after her death; and the property remained in the same state at her death, as if no such power of appointment had been created. It follows, therefore, as a plain and necessary consequence, that the rights of her husband at her death, as survivor, were the same as if no such settlement had been made. I believe it has been the invariable practice, and that the uniform course of the precedents will show it, that when it

If a wife, ha-ving a power of appointment by marriage articles, which contain no pro-vision for the disposition of her separate property on her death, dies without ma-king any ap-pointment, the property goes to the husband, as survivor, as if no such pow-er of appoint-ment had been created.

is intended in a marriage settlement to exclude the right of the husband to her personal property, in the event of his surviving her, and, in default of her appointment, an express provision to that effect is inserted in the deed. The case of *Bailey* v. *Wright*, (18 *Ves.* 49.) which was cited upon the argument, affords a clear illustration of the rule and practice on this subject. By the marriage settlement, in that case, the fortune of the wife was settled in trust; and in case of her death, in the life of her husband, to pay according to her appointment, by deed or will; and, in default of such appointment, *in trust for her next of kin, or personal representatives.* The wife died without appointment, and the husband was held to be excluded, as not being within the intention of the limitation. If there had been no such words of limitation, it would never have been made a question, whether the property did not devolve upon the husband, by due course of law.

The Court cannot take away the right of the husband to the personal estate of his wife, when it is not taken away by the settlement, or by the exercise of the power of appointment under it. When the settlement makes no disposition of the property, in the event of the wife's death, and provides only for her dominion over it during coverture, the right of the husband, as survivor, is a fixed and stable right, over which the Court has no control, and of which he cannot be devested. The settlement cannot be extended, by construction, beyond the just and fair import of its provisions; and, clearly, the Court cannot create a settlement, or a disposition of property, in violation of the *jus mariti*, when none has been made by the party. There is, then, nothing in the instrument in question, that barred the husband, in default of an appointment by the wife, to claim and appropriate to himself her personal estate remaining undisposed of at her death. Whether he succeeds to her property *jure mariti*, or as her next of kin, as many of the books have expressed it, does not seem to be at all mate-

rial ; and any question as to the accuracy of the expression, is rather matter of verbal criticism, than of substantial use. The husband is her next of kin, by relation of marriage ; and he takes in consequence of being her husband, and by reason of that relation. It is in this sense only, that he is spoken of, as her next of kin. When the wife's next of kin are mentioned in settlements, the words are understood to be used in the ordinary and popular sense, and it is evident the husband is not intended. It is sufficient, in this case, to observe, that when the wife's choses in action, or other personal property, over which she has control by settlement, is left undisposed of after her death, the husband, who survives her, must, of course, take it, and with as good a right and title in law, as the heir takes the undevised estate of his ancestor.

2. The deed said to have been executed by the husband, on the 11th of *February*, 1809, has been assailed on several grounds. It is stated to be a *nudum pactum*, without any consideration to support it; and that it was never accepted by the trustees, to whom the deed was made. It is further urged, that it was never duly delivered, but was retained by the husband, without any intention to deliver it; and that it was, therefore, never executed, in point of fact, or in contemplation of law. I am inclined to the opinion, that this is the proper and necessary conclusion, from a view of the testimony in the case. But I have not thought it material, to enter into a critical examination of the proofs on this point, as to the delivery of the deed, in order to illustrate and confirm that opinion ; for, assuming it to have been duly executed, and for a valuable consideration, it does not affect the claim of the plaintiff.

The covenant was made with two trustees for *Catharine Hopkins*, with whom the marriage was intended; and it recited, that " it was his wish and intention to secure to her her real and personal property, so that she might as fully enjoy, it to all intents and purposes, after

1823.

STEWART
v.
STEWART.

The husband is next of kin to his wife, by relation of marriage ; and in case of her death, he takes her personal property, by reason of that relation.

marriage as before. He, therefore, covenanted with the two trustees, that his wife, during coverture, should have to her own use all the personal property belonging to her at her marriage, or which might come to her during coverture, by devise or otherwise, and that she might convey away the same, according to the forms of law, by testament or otherwise; and that, during coverture, she should enjoy the right of dower in the estate of her former husband, and the rents and profits of any real estate to which she might be entitled, as fully as if she had remained sole, he thereby releasing all his marital rights in and over the same, and covenanting to make other assurances, to carry more fully into effect the intent of the covenant."

The whole of the provisions in this instrument, refer to the use and enjoyment of her property by the wife *during coverture*, and to her exercise of power over it. There is no provision for the disposition of the property after her death, other than a power of disposition given to the wife, which in this case she never exercised. At her death, the covenant had fulfilled its object, and its provisions were exhausted. The succession to that property remained precisely as if no such covenant had been made. Nothing can be clearer to my mind than this construction and operation of the covenant. The words, at the latter end of it, releasing all his marital rights in and *over the same*, refer to the immediate antecedent provision, relative to the rents and profits of her real estate, according to the maxim, *idem semper antecedenti proximo refertur*. And if that release was to be construed to apply to every part of the covenant, it could have no greater operation and effect than the provisions in the covenant, and ought to be construed to be only a release of his marital rights *during coverture*. If *A.* was to give to *B.* a lease for life of a farm, with all the powers and privileges incident to a lease for life, and was to add, at the end of the lease, a release of all his powers and privileges to the same, the release never could be

construed to bar his interest in the reversion. The whole instrument would be taken together in ascertaining the construction to be given to the release, and it would strike every one as manifestly unreasonable and unjust, to give to the release a greater and more extended operation than the interest which had been previously created, and to which it applied. It would make the instrument inconsistent and repugnant with itself. It appears to me, therefore, that the right of the husband as survivor, and of the plaintiff as his executrix, to the bank shares standing in the name of his wife at her death, rests upon solid grounds of law, clear and unaffected by either of the ante-nuptial instruments, which have been set up by the representative of the wife.

There are other views of this subject, which have been taken by the counsel, that are not destitute of interest, but on which I need not dwell. The stock in question, was purchased by the husband in the name of his wife, with money belonging to her, which had come to his possession, at a time when there was no subsisting or acting trustee under her settlement, and before there was any pretence of an actual delivery by the husband of his covenant. It is difficult, therefore, to perceive how the money or stock could be affected by either of those instruments. There is, also, much weight of argument against the admission of the claim by the administratrix *de bonis non*, from the fact, that during the joint lives of the husband and wife, the dividends on the stock were received by the husband, and after her death, by him, for upwards of three years, as her administrator, and applied to his own use, without any objection on the part of her next of kin. An acquiescence to that extent, is entitled to great consideration, in a case accompanied with the present circumstances. But I think it unnecessary to press these difficulties into the case, for it is sufficient to say, that neither of these ante-nuptial instruments constitute a bar to the claim of the plaintiff.

I shall, accordingly, declare, that those instruments do

1823.

STEWART
v.
STEWART.

not furnish any valid and sufficient objection in equity, to the right of the plaintiff, as the executrix of the husband, to the stock in question ; and that the defendant, as administratrix *de bonis non* of the wife, holds the same as trustee for the plaintiff, as the legal representative of the husband; and I shall direct the shares to be transferred to the plaintiff, and the dividends in arrear paid to her, and that the costs of the defendants, respectively, except the costs arising on taking the suppressed testimony, and including the costs of the directors of the *Bank of America*, as well as the costs of the plaintiff, be paid out of the fund.

Decree accordingly.